### ST. PAUL FIRE & MARINE INS. CO. v. KNICKERBOCKER STEAM TOWAGE CO.

(Circuit Court of Appeals, First Circuit. April 26, 1899.)

No. 243.

1. MARINE INSURANCE—CONSTRUCTION OF POLICY.

A marine policy permitted a tug to navigate the waters of Long Island Sound and shores and "all inland and Atlantic Coast waters of the United States, and all waters adjacent, connecting, or tributary to any of the above waters." The policy also provided that any deviation beyond the limits named should not avoid the policy, but that no liability should exist during such deviations, and "upon the return of said vessel within the limits named herein" the policy should be and remain in full force and effect. The tug went without the waters described to Mexico, thence with a tow she started for New York, and when off Charleston Bay, standing in for a supply of coal, was wrecked on a shoal about 1½ miles from the nearest mainland. Held, that the place of loss was in the "Atlantic Coast waters of the United States," and was covered by the policy.

2. SAME—CONDITIONS—OVERINSURANCE.

A policy of marine insurance provided that it should be void if other insurance was made on the vessel exceeding $50,000. The policy also provided that, in the event of a deviation from certain waters, the policy should be suspended, and take effect on return to such waters. The tug, desiring to go outside of the waters designated, applied to defendant

company for permission and indorsement on the policy, which was refused. Thereafter it took out a policy in another insurance company, which, with the policies then existing, would have exceeded the prescribed limits. The latter policy provided that, if the assured had other insurance prior in date, the company should be liable only for so much as the amount of the prior insurance was deficient towards covering the property insured. This prior insurance was to the total value of the vessel. *Held* that, as such latter policy could take effect only on the suspension of the other policies, and was at once suspended upon the revival of the other policies on a return within the limits, there was at no time insurance in effect more than the agreed amount, and the policy sued on was not void for overinsurance.

In Error to the Circuit Court of the United States for the District of Maine.

Eugene P. Carver (Edward E. Blodgett, on the brief), for plaintiff in error.

Orville D. Baker, for defendant in error.

Before PUTNAM, ALDRICH, and BROWN, District Judges.

BROWN, District Judge. This suit is upon a marine policy on the tug B. W. Morse. The policy runs for the term of one year from May 1, 1893, to May 1, 1894, "unless sooner terminated or made void by conditions hereinafter expressed." The loss occurred on October 10, 1893, within the term of the policy. The tug was "privileged to use and navigate the port, bays, and harbor of New York, East and North or Hudson rivers, waters of New Jersey, Long Island Sound, and shores, and waters as far as New Bedford, and all inland and Atlantic Coast waters of the United States, and all waters adjacent, connecting, or tributary to any of the above waters, but not beyond said waters, and tow vessels to and from sea, and search for vessels at sea, according to the custom of the port of New York."

The questions in this case arise from the fact that the tug, during the term of the policy, went without the waters described, on a voyage from New York to Nassau, thence to Havana, thence to Progresso, Mexico, whence, with a schooner in tow, she started on October 4, 1893, bound for New York. On this voyage, the tug reached latitude 31.35 N., and longitude 79.40 W., on October 9th, and then stood in for Charleston bar and harbor for a supply of coal, and on the next day, October 10th, was wrecked on Pumpkin Hill shoal, about 1½ miles from the nearest mainland, and became a total loss. The circuit court found "as matter of fact, under the proper construction of the policy, that the place of loss was covered by the policy, and that it was in Atlantic Coast waters of the United States." The assured contends that the test of liability is purely geographical, and that if at the time of loss the vessel was actually within the geographical limits described in the policy the insurer is liable. The following provision is relied upon:

"Any deviation beyond the limits named in this policy shall not void this policy, but no liability shall exist during such deviation; and, upon the return of said vessel within the limits named herein, this policy shall be and remain in full force and effect."

In this opinion we will use the terms "plaintiff" and "defendant" to indicate the relation of the parties in the original suit.

The defendant contends that the tug had deviated from the waters covered by the policy, and had not returned thereto, within the terms of said policy, so as to be covered by it. It is urged that the putting in of the tug to Charleston was but an incident of her voyage from Progresso to New York, and that, as she had not completed the voyage on which she was engaged, she was lost on a voyage not covered by the policy in suit. We have then to determine whether the parties to the present contract intended to cover losses occurring in defined geographical limits within the period of the policy, or whether they contracted with reference to voyages from place to place within these limits, excluding losses occurring within the specified time and place upon voyages to and from ports without the specified limits. So far as we can see, there is no prima facie balance of probability in favor of either contention. Voyage policies and time policies are equally recognized in law, and a time policy has no necessary reference to any specified voyage or voyages. In fact, the printed form used by the parties seems to have been designed for a time policy applicable to special waters without regard to voyages. As originally printed it read:

"Privileged to use and navigate the port, bays, and harbor of New York, East and North or Hudson rivers, waters of New Jersey, Long Island Sound, and shores,

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

and all waters adjacent, connecting, or tributary to any of the above waters, but not beyond said waters, and tow vessels to and from sea, and search for vessels at sea, according to the custom of the port of New York."

The waters named are such that their limits both towards the land and towards the sea are reasonably ascertainable. While there may be some uncertainty as to the location and extent of "waters adjacent, connecting, or tributary," yet it is apparent that these words are for the benefit of the assured, and to avoid a too rigid application of the restriction to the limits previously named. Though it might in some cases be necessary to refer to the intended employment of the vessel, in order to determine whether she were within "waters adjacent, connecting, or tributary," the possible necessity for such an incidental inquiry does not disturb, but tends rather to confirm, the opinion that the original printed form covers the vessel in limits determined by geographical description rather than by reference to voyages. Were the case before us upon the printed form without written additions, and had the loss occurred in the waters named therein, we should have no doubt of the correctness of the plaintiff's contention. We have then to inquire as to the effect of the written addition of the words, "and waters as far as New Bedford, and all inland and Atlantic Coast waters of the United States." A difficulty arises from the words, "and all inland and Atlantic Coast waters of the United States." Defendant's counsel argues that these words are to be taken conjunctively, and mean merely such of the coast waters as are inland waters. We cannot so interpret the clause, since this is in effect to reject the words "Atlantic Coast" as surplusage. The difficulty is in applying as a designation of geographical limits words so indefinite as "Atlantic

Coast waters of the United States." Were it necessary in this case to determine at what point on her voyage from Progresso the vessel entered these waters, or were it a question of defining the easterly boundary of these waters, serious doubts might arise under the terms of the contract. If a marine league were taken as the measure of the breadth of these waters, it might exclude the vessel on a voyage from port to port within the Atlantic Seaboard, even though she were on the usual course between these ports. It might exclude the vessel when driven off the coast by stress of weather. Therefore there would be reason in holding these words to mean those waters usually employed by vessels in voyages in the coasting trade between ports on the Atlantic Coast, and that a vessel properly pursuing such a voyage must be assumed to be within the Atlantic Coast waters, though at times scores of miles from shore. The waters would then be marked out, not by any particular voyage of any particular vessel, but by the usual course of trade. Conceding, however, that this contract of insurance contains terms which would in some cases be difficult of application, a recognition of these difficulties does not lead to the adoption of the defendant's view that the policy must be considered as if it covered a series of voyages, since by adopting this construction we fall into new difficulties in adapting it to the contemplated business. Referring to the contract for provisions as to the employment of the tug, we find:

"Warranted by the assured to be employed exclusively in the towing and wrecking business, * * * to be used mainly for general towing purposes, * * * and tow vessels to and from sea, and search for vessels at sea, according to the custom of the port of New York."

In construing this policy according to the nature of the business, we must first bear in mind that this business requires neither a port of lading nor a port of discharge. It is apparent, we think, that the parties did not have in mind that the tug should be solely engaged in a series of voyages from port to port in the coastwise trade. The business of towing might call for a long succession of trips, which could not be deemed voyages in the ordinary sense. The wrecking business contemplated by the contract might involve her in risks differing greatly from those of ordinary coastwise voyages from port to port. Between these trips she may have no necessity to make port, save for supplies and repairs. We cannot construe the policy in such manner as to impose upon her idle entries into port that would be of no service and might lessen her earning power. The fact that the business differs so greatly from that of a carrying trade, where the parties contemplate a terminus a quo and a terminus ad quem, renders it highly probable that only geographical limits were intended. The language of the policy is apt to express such an intention. See Hennessey v. Insurance Co., 28 Hun, 98. In ordinary voyage policies, it is not contemplated that there shall be a departure from the defined course. Here, however, the parties not only contemplated departures from the described waters, but expressly provided for them by saying that they should not void the policy; providing, also, that the policy should be in full force upon "the return of said vessel within the limits named herein." As in cases of doubt construction should be

favorable to the assured, the defendant has the burden of satisfying us that the words "return within the limits" are equivalent to the words "return to a place of good safety within the limits"; in other words, that the word "return" used in this policy of marine insurance has a technical meaning and connotes a place of good safety. We find no evidence or legal authority that would justify us in giving it such a meaning in this case. On the contrary, considering the fact that the instrument is one drawn by an insurance company, we think that, had a return to a place of good safety been intended, the company would not have failed for lack of apt words or skill of expression to employ unequivocal and definite terms to express its intention. There is a wide difference between a return to certain waters and a return to places of good safety within those waters, and the assured is entitled to the full benefit of that difference. Should we hold that after a suspension the policy revives only upon a return to a place of good safety, at the end of a voyage begun without the limits, we should construe the contract not according to the tug's whole business, but according only to that part in which she engages in a full voyage from port to port. A proper construction must be one that provides for her entire business. If voyages are disregarded, and only geographical limits are provided for, the contract, so construed, is adequate to all the requirements of the business. The original printed form seems appropriate to meet these requirements, and we are of the opinion that the written additions do not indicate an intention in the present case to change the character of the contract set forth in the printed form. We can derive no aid from the cases of Mark v. Insurance Co., 13 C. C. A. 157, 64 Fed. 804, and Insurance Co. v. O'Connell, 29 C. C. A. 624, 86 Fed. 150, as they differ so materially from the case before us as to be inapplicable as precedents. Whatever may be the difficulty in interpreting the words "Atlantic Coast waters" in cases where the easterly boundary is in question, no such difficulty arises as to the western boundary. There is no need for reference to any voyage to determine whether a vessel was wrecked in Atlantic Coast waters, if she were wrecked on the Atlantic shores of the United States, or upon a shoal situated a mile and a half from the mainland, as was here the case. The popular meaning of the terms, as well as the meaning that has reference to the three-mile limit and that which has reference to the usages of the coasting trade, are all properly applicable to the place where this vessel was wrecked.

We agree, therefore, with the finding of the circuit court, "as matter of fact, under the proper construction of the policy, that the place of loss was covered by the policy, and that it was in Atlantic Coast waters of the United States." We are also of the opinion that the facts found by the court below raise no question of the seaworthiness of the vessel at the time the policy in suit reattached on her return from without the limits.

The defendant next contends that the policy in suit was avoided by other insurance, in violation of the following provision:

"It is also agreed that this policy shall become void if any other insurance is or shall be made upon the vessel interested, hereby insured, which, together with this insurance, shall exceed the sum of fifty thousand dollars."

It appears that during or before the time covered by the general voyage from New York out and return, and before the loss of the tug, the plaintiff applied to the defendant company for permission and requested an indorsement on this policy for the general voyage above described, which was refused; and that thereafter, on or about September 21, 1893, the plaintiff took out a policy in the Atlantic Mutual Insurance Company for $17,500. It is contended that thereby the plaintiff exceeded the permitted insurance. It is agreed that at the date of the issue of the Atlantic policy there was $45,000 of insurance on the vessel, other than the $5,000 policy in suit. Each of the policies was based upon an agreed valuation of $50,000, and the policies in the aggregate reached that amount. So that prior to September 21, 1893, there was $50,000 insurance, exclusive of the Atlantic policy. The loss occurred during the term covered by all the policies. The Atlantic policy contained, however, the following:

"Provided always, and it is hereby further agreed, that if the said assured shall have made any other assurance upon the premises aforesaid, prior in day of date to this policy, then the said Atlantic Mutual Insurance Company shall be answerable only for so much as the amount of such prior assurance may be deficient towards fully covering the premises hereby assured."

As the prior assurance was to the total value of the vessel, and was in effect at the time and place of loss, it is evident, we think, that the express terms of the Atlantic policy excluded it from liability, since there was no deficiency. By its terms, the Atlantic policy, under the existing state of facts, could take effect only upon suspension of the other policies, and was at once suspended upon the revival of the other policies upon a return within the limits, so that at no time was there in effect more than the agreed sum of $50,000. The policy in suit, therefore, was not void for overinsurance, nor can the defendant reduce its liability by any claim for contribution by the Atlantic company. The fact that the defendant had refused permission to employ the tug outside the permitted waters we think immaterial. The rights of the parties were fixed by the contract contained in the policy in suit, and neither the refusal of the defendant company to enlarge its liability, nor the act of the plaintiff in insuring risks not covered by the former policy, can affect the construction of the contract in question, or restrict the legal obligations thereby incurred.

The judgment of the circuit court is affirmed, with interest, and the Knickerbocker Steam Towage Company, defendant in error, is awarded the costs of this court.